IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| KACI TAYLOR JOHNSON, | ) | CASE NO. 5:24-CV-01703-PAG |
| | ) | |
| Plaintiff, | ) | JUDGE PATRICIA A. GAUGHAN |
| | ) | UNITED STATES DISTRICT JUDGE |
| v. | ) | |
| | ) | MAGISTRATE JUDGE |
| LELAND DUDEK, | ) | JENNIFER DOWDELL |
| ACTING COMMISSIONER OF | ) | ARMSTRONG |
| SOCIAL SECURITY[1] | ) | |
| | ) | **REPORT AND RECOMMENDATION** |
| Defendant. | ) | |

## I.      INTRODUCTION

Plaintiff Kaci Taylor Johnson ("Ms. Johnson") seeks judicial review of the final decision of the Commissioner of Social Security denying her applications for Social Security Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI"). This matter is before me pursuant to 42 U.S.C. §§ 405(g), 1383(c)(3), and Local Rule 72.2(b). (*See* ECF non-document entry dated October 2, 2024). For the reasons set forth below, I RECOMMEND that the Court AFFIRM the Commissioner's final decision.

## II.      PROCEDURAL HISTORY

Ms. Johnson filed prior applications for DIB and SSI on January 24, 2020, alleging disability beginning on May 1, 2017. (Tr. 83). The SSA denied those applications initially and on reconsideration, and a prior ALJ affirmed the denial on November 27, 2020. (Tr. 80).

---

[1] Ms. Johnson named Martin O'Malley, the Commissioner of Social Security at the time she filed her complaint, as the defendant in this action. Mr. O'Malley resigned as Commissioner of Social Security in November 2024. Leland Dudek is currently serving as Acting Commissioner.

On March 17, 2022 and April 21, 2022, Ms. Johnson filed her applications for DIB and SSI, respectively. (Tr. 273, 280). Ms. Johnson's applications related to her endometriosis, Sjogren's syndrome, chronic pain system, fibromyalgia, gastritis, bone spurs, thyroid issues, post-traumatic stress disorder ("PTSD"), anxiety, depression, bipolar disorder, obsessive compulsive disorder, and borderline personality disorder. (Tr. 304).

The Social Security Administration ("SSA") denied Ms. Johnson's applications initially and upon reconsideration. (Tr. 158, 163). Ms. Johnson requested a hearing before an administrative law judge ("ALJ"). (Tr. 179). The ALJ held a hearing by remote videoconference on July 10, 2023, at which Ms. Johnson was represented by counsel. (Tr. 45). Ms. Johnson testified, as did an impartial vocational expert ("VE"). On September 18, 2023, the ALJ issued a written decision, finding that Ms. Johnson was not disabled. (Tr. 14). The ALJ's decision became final on April 8, 2020, when the Appeals Council declined further review. (Tr. 1).

On October 2, 2024, Ms. Johnson filed her complaint, challenging the Commissioner's final decision. (ECF No. 1). Ms. Johnson asserts the following assignments of error:

(1)    The ALJ committed harmful error when he applied the wrong standard of review when he adopted the psychological limitations as set forth by the prior Administrative Law Judge.

(2)    The ALJ erred when he failed to support and/or address consistency with his conclusions regarding the opinions of the treating sources.

(3)    The ALJ erred when he failed to properly evaluate Plaintiff's headaches and the totality of her impairments throughout the sequential evaluation.

(ECF No. 8, PageID # 1836).

## III.    BACKGROUND

### A.    Personal, Educational, and Vocational Experience

Ms. Johnson was born in 1994 and was 26 years old on the alleged onset date. (Tr. 53). She has a high school diploma. (Tr. 54). Ms. Johnson is not married and has one son. (Tr. 53).  She does not have any past relevant work. (Tr. 54-55).

B.    **Relevant Hearing Testimony**

1.    ***Ms. Johnson's Testimony***

With respect to her physical impairments, Ms. Johnson testified that she has achy joints and muscles and restless legs. (Tr. 56). She also testified that she has difficulty bending down too much. *Id*. Ms. Johnson testified that some days are worse than others, and that she tries to do the best she can for her son. *Id*. She also testified that she gets headaches, including migraines. (Tr. 56). She testified that she gets headaches once or twice per week, but that they are mild and do not require her to lay down or go to sleep. (Tr. 57). She agreed with the ALJ that her headaches were "more of a nuisance and a pain" as opposed to debilitating. *Id*. If a headache is bad enough, she will rest. (Tr. 70). She also uses ice packs and takes over-the-counter medication. *Id*. Ms. Johnson testified that she does occasionally have debilitating migraines, but that her last one was two months ago. (Tr. 57-58).

Ms. Johnson testified that she experiences joint pain throughout her body, but that it is worse in her feet, ankles, and neck. (Tr. 57). She also testified that she has bone spurs, plantar facial fibromatosis, and arthritis in her feet, which makes it difficult for her to stand and walk for extended periods of time. (Tr. 58). She testified that her ankles swell if she is on her feet for over an hour and a half. (Tr. 70). She further testified that she has pain in her lower back radiating to her legs, as well as pain in her cervical spine and neck. (Tr. 59, 62). The pain makes it difficult for her to turn her neck side to side and to reach above her head. (Tr. 62-63). Ms. Johnson also testified that she has endometriosis, which causes abdominal pain, cramping, and bloating. (Tr. 60).

Ms. Johnson testified that she has Sjogren's syndrome, which causes rashes and dry hands. (Tr. 61). She also experiences boils in her groin and armpit area, which her doctors were still trying to diagnose as of the hearing date. *Id*. She testified that the doctors believe she has hidradenitis suppurativa. (Tr. 71). In addition, she testified that she has postural orthostatic tachycardia

syndrome, which causes dizziness and lightheadedness. (Tr. 63). She testified that the condition is episodic rather than constant, and that she has episodes every few weeks. *Id*. Ms. Johnson further testified that she has thyroid issues, gastritis, and irritable bowel syndrome. (Tr. 64).

Ms. Johnson testified that she is able to walk approximately a quarter of a mile without stopping. (Tr. 58). She does not use a cane or a walker, but she does wear an ankle brace whenever she needs to walk. (Tr. 59). She also needs to stand up every 20 to 30 minutes due to pain and discomfort. *Id*. Ms. Johnson further testified that she is able to lift approximately 10 pounds with her good side but that it would be difficult for her to do so with both arms. (Tr. 60).

With respect to her mental health issues, Ms. Johnson testified that she has difficulty focusing and concentrating. (Tr. 56). She also testified that she feels very overwhelmed and nervous all the time. *Id*. She further testified that she experiences panic attacks or anxiety attacks a few times per day. (Tr. 66). She also experiences flashbacks due to past events and feels like she is looking over her shoulder all the time. *Id*. Ms. Johnson further testified that there are times when she has lots of energy and makes impulsive decisions, but that the frequency of those occasions has decreased over the last few years. (Tr. 66-67). She does not take any antidepressants or anxiety medications. (Tr. 67). She attends therapy every other week with a counselor and has a program that she does twice a month and every Saturday. *Id*. She testified that she is in recovery for substance abuse, and that she has been sober for nearly a year. (Tr. 69).

Ms. Johnson testified that she has long haul COVID, which has played a role in her worsening memory, focus, and anxiety. (Tr. 62). She also testified that, at least once per week, she has a day where she does not want to get out of bed or talk to anyone. (Tr. 64-65). Ms. Johnson testified that she is respectful and kind and that she gets along with others fairly well, but that people would probably describe her as irritable and moody. (Tr. 65). She further testified that she has trouble sleeping twice a week and that she experiences fatigue during the day. (Tr. 68).

4

Ms. Johnson testified that she has been able to manage her hygiene for the past year, but that she was not able to do so before that time. *Id*. She also testified that she does laundry, washes the dishes, cooks, and cleans, and that she splits up chores with her mother. *Id*. She further testified that she is able to go to the store but that she prefers for someone to come with her. *Id*. She tries not to go out too often, but people will come to visit her. *Id*.

### 2. *Vocational Expert's Testimony*

The ALJ asked the VE to consider a hypothetical individual with Ms. Johnson's age, education, and vocational background who was limited to light work and who could frequently reach overhead; occasionally climb ramps or stairs; never climb ladders, ropes, or scaffolds; occasionally balance, stoop, kneel, crouch, or crawl; never be exposed to unprotected heights, hazardous machinery, or dangerous driving; was limited to simple routine tasks that are not performed at a production rate pace; was limited to simple work-related decisions; and could tolerate few changes in routine work settings. (Tr. 73-74). The VE testified that the hypothetical individual could perform jobs existing in significant numbers in the national economy, including work as a marker, classifier, and housekeeper. (Tr. 74). The VE next asked if the hypothetical individual could still work if the individual was limited to sedentary work. *Id*. The VE testified that the hypothetical individual could perform work as an ink printer, dial marker, and document preparer. (Tr. 74-75). Finally, the VE testified that it would be work preclusive if the individual were off task more than twenty percent of the time or absent from work three times per month. (Tr. 75).

In response to a question from Ms. Johnson's counsel, the VE testified that it would be work preclusive if the hypothetical individual could only sit or stand for 15 minutes at a time, walk fewer than two hours in a workday, and would need to walk around every 15 minutes and take additional breaks every 30 minutes. (Tr. 76). The VE also testified that the hypothetical individual

could not work if the individual needed to be reminded of her job at least once per day because of brain fog. *Id*.

### C. **Relevant Opinion Evidence**

#### 1. ***State Agency Medical Consultants***

On June 13, 2022, Mehr Siddiqui, M.D., a state agency medical consultant, opined that Ms. Johnson could occasionally lift or carry 20 pounds and frequently lift or carry 10 pounds; could sit and stand or walk for six hours in an eight-hour workday; could never climb ladders, ropes, or scaffolds; could occasionally stoop, kneel, crouch, and crawl; and should avoid all exposure to hazardous machinery and heights. (Tr. 115-17). On September 19, 2022, Leon Hughes, M.D. affirmed Dr. Siddiqui's findings on reconsideration. (Tr. 137).

The ALJ found that the state agency medical consultants mildly understated Ms. Johnson's manipulative and postural limitations and mildly overstated her exertional limitations. (Tr. 29). The ALJ also found that the state agency medical consultants were minimally imprecise with respect to her environmental limitations. *Id*. However, the ALJ found that the opinions were persuasive because they were generally and broadly consistent with and supported by the overall evidence of record. *Id*.

#### 2. ***State Agency Psychologists***

On May 31, 2022, Akanksha Dutt, Psy.D. a state agency psychologist, opined that Ms. Johnson had moderate limitations in her ability to understand, remember, or apply information; interact with others; concentrate, persist, or maintain pace; and adapt or manage herself. (Tr. 114). Dr. Dutt also opined that Ms. Johnson was limited to performing simple, routine tasks that do not involve arbitration, negotiation, or confrontation and without production quotas and with any significant changes in workplace tasks or duties to be explained in advance. (Tr. 117). Dr. Dutt's opinions were an adoption of the prior ALJ's RFC. (Tr. 114, 117). On September 11, 2022,

Aracelis Rivera, Psy.D. concurred with Dr. Dutt's findings on reconsideration. (Tr. 138).

The ALJ found that the state agency psychologists overstated Ms. Johnson's cognitive limitations to a minor degree and understated her adaptive limitations to a minor degree. (Tr. 30). However, the ALJ found that their opinions were persuasive because they were broadly and generally consistent with and supported by the evidence of record. *Id*.

### 3. *Inderprit Singh, M.D.*

In February 2022, Dr. Singh, Ms. Johnson's treating rheumatologist, completed a physical medical source statement for Ms. Johnson. (Tr. 1007). Dr. Singh diagnosed Ms. Johnson with Sjogren syndrome, fibromyalgia, hypermobility spectrum disorder, and chronic low back pain. *Id*. Dr. Singh opined that Ms. Johnson could sit or stand for 15 minutes at a time. (Tr. 1008). Dr. Singh also opined that Ms. Johnson could sit and stand or walk for fewer than two hours in an eight-hour workday, and that she would need to take a five-minute walk every 15 minutes. *Id*. Dr. Singh further opined that Ms. Johnson would need to take ten-to-fifteen-minute breaks every thirty minutes due to muscle weakness, chronic fatigue, and pain. *Id*. Dr. Singh opined that Ms. Johnson could occasionally lift and carry fewer than 10 pounds, rarely lift or carry 10 pounds, and never lift or carry 20 pounds or more. (Tr. 1009). Dr. Singh also opined that Ms. Johnson would be off-task at least 25% of the day and was incapable of handling even low stress work. (Tr. 1009-10). Finally, Dr. Singh opined that Ms. Johnson would be absent from work more than four days per month as a result of her symptoms. (Tr. 1010).

In October 2022, Dr. Singh completed a mental impairment questionnaire. (Tr. 1244). Dr. Singh opined that Ms. Johnson was "unable to meet competitive standards" in a number of functional categories, including her ability to carry out instructions, maintain concentration, manage attendance, sustain an ordinary routine, work in proximity to others, complete a normal workday, perform at a consistent pace, understand and remember instructions, and set realistic

goals. (Tr. 1244-45). Dr. Singh also opined that Ms.  Johnson was limited in her ability to remember work-like procedures, understand and remember short and simple instructions, respond appropriately to changes in the workplace, and take appropriate precautions from normal hazards. (Tr. 1245). Dr. Singh further opined that Ms. Johnson would be absent from work three to four days per week and would be off-task 70-80% of the time. *Id*.

The ALJ found that Dr. Singh's opinions were  not persuasive because they were not consistent with the overall evidence of record and Dr. Singh's treatment records. (Tr. 29, 31).

### 4.    *Matthew Inman, M.D.*

On November 3, 2022, Dr. Inman, Ms. Johnson's primary care physician, completed a mental impairment questionnaire. (Tr. 1262). Dr. Inman opined that Ms. Johnson had no useful ability to function with respect to sustaining and ordinary routine, working in proximity to others, completing a normal workday, accepting instructions and responding to criticism, getting along with coworkers and peers, and taking appropriate precautions from hazards. (Tr. 1262-63). Dr. Inman also opined that Ms. Johnson was unable to meet competitive standards with respect to carrying out detailed instructions, maintaining attention and concentration, performing activities within a schedule, maintaining attendance and punctuality, performing at a consistent pace, maintaining socially appropriate behavior, responding appropriately to changes, and setting realistic goals. *Id*. Dr. Inman further opined that Ms. Johnson was seriously limited with respect to carrying out very short and simple instructions, remembering locations and procedures, and understanding and remembering detailed instructions. *Id*. He also opined that Ms. Johnson was limited with regard to her ability to remember very short and simple instructions, interact appropriately with the general public, and ask simple questions or request assistance. *Id*. He opined that Ms. Johnson would be absent from work most days and would be off-task nearly 100% of the time. (Tr. 1263).

The ALJ found that Dr. Inman's opinion was not persuasive because it was not consistent with his treatment records and only marginally consistent with the overall record. (Tr. 31).

**D.** **Relevant Medical Evidence**

*1.* ***Physical Impairments***

On November 30, 2020, Ms. Johnson presented to Dr. Inman for a follow-up visit. (Tr. 533). Ms. Johnson requested laboratory tests regarding her thyroid. *Id*. She also reported that she was having withdrawal from her medications and experiencing high anxiety. *Id*. Ms. Johnson complained of fatigue; leg cramps with exertion; nausea; muscle cramps, aches, and weakness; joint pain; joint swelling; back pain; anxiety; and moodiness. (Tr. 535). It was noted that her past medical history included car accidents, multiple falls, endometriosis, hypoglycemia, restless leg syndrome, anxiety, depression, PTSD, and fibromyalgia. (Tr. 533). On examination, Ms. Johnson was alert and cooperative, with normal mood and affect, a normal attention span, and normal concentration. (Tr. 537). She was diagnosed with medication monitoring problems, weight gain, bipolar disorder, borderline personality disorder, obsessive-compulsive personality disorder, history of thyroidectomy, and obesity. (Tr. 538). She was started on Promethazine. *Id*.

On December 18, 2020, Ms. Johnson saw Dr. Singh. (Tr. 959). Ms. Johnson reported that her pain levels were out of control and that she was struggling badly. *Id*. Her examination was unremarkable, and she presented with normal mood and affect, thought content, and judgment. (Tr. 960). Dr. Singh noted that her Sjogren syndrome required observation. (Tr. 961).

On July 13, 2021, Ms. Johnson had a follow-up visit with Dr. Inman. (Tr. 519). She reported fever, chills, sweats, fatigue, weight loss, dizziness, night sweats, lack of appetite, shortness of breath, muscle aches, weakness, joint paint, back pain, stiffness, neck pain, difficulty concentrating, poor balance, headaches, disturbances in coordination, daytime sleeping, numbness, tingling, anxiety, depression, moodiness, lack of motivation, helplessness,

hopelessness, heat intolerance, and weight change. (Tr. 521-22). Her physical examination was unremarkable. (Tr. 523-24). She was instructed to stop smoking. (Tr. 523).

On September 20, 2021, Ms. Johnson went to the Mercy Medical Center emergency room, complaining that she had a lump on her left thigh, pain running down her left leg, pain in her left ovary, poor appetite, and diarrhea. (Tr. 647). On examination, Ms. Johnson displayed mild tenderness in her left lower abdomen. (Tr. 648). She was alert and oriented, with normal affect, mood, memory, and judgment. (Tr. 649). On September 27, 2021, Ms. Johnson underwent a sonogram of her ovaries, which showed no abnormalities. (Tr. 629).

On November 8, 2021, Ms. Johnson was referred to Mercy Cardiovascular Institute for a cardiac evaluation. (Tr. 468). She reported resting tachycardia, anxiety, and stress. *Id*. She also reported that she had recently been fired from her pain management clinic. *Id*. An EKG revealed normal sinus rhythm with a sinus arrhythmia. (Tr. 469). It was noted that her EKG was within normal limits. *Id*.

On December 1, 2021, Ms. Johnson underwent an infectious diseases consultation for management of a recurrent staph infection. (Tr. 1114). She reported frequent abscesses in her suprapubic area. *Id*. On examination, she had three small resolving furuncles in her suprapubic region. (Tr. 1117).

On December 16, 2021, Ms. Johnson saw a gastroenterologist for her complaints of diarrhea and nausea. (Tr. 561). She reported that her diarrhea was moderate-severe and that it occurred persistently. *Id*. She also reported abdominal pain, anxiety, chest pain, decreased appetite, and weakness. *Id*. A physical examination was normal. (Tr. 562). She was diagnosed with dysphagia, unspecified, and an endoscopy was ordered. (Tr. 563). Ms. Johnson had the endoscopy on December 23, 2021, which revealed acute gastritis with bleeding. (Tr. 555).

On January 14, 2022, Ms. Johnson again presented to the Mercy Medical Center

emergency room, complaining of cough and congestion, abdominal pain, and headache. (Tr. 574). She reported that her chest hurt when she took deep breaths, and that she was experiencing nausea and vomiting. *Id*. She had full range of motion and strength in all four extremities and normal sensation, gait, and reflexes. (Tr. 576). CT scans of her head, chest, and abdomen/pelvis were negative for acute abnormalities. (Tr. 583). It was noted that the etiology of her symptoms was unclear but may be related to her fibromyalgia. *Id*.

Ms. Johnson had x-rays taken on her back on January 19, 2022, which showed degenerative changes in her cervical and lumbar spine without acute osseous findings. (Tr. 1020-21).

On February 1, 2022, Ms. Johnson had a follow-up visit with Dr. Singh. (Tr. 930). She reported that she was doing okay, but that her joint pain was flaring up and her endometriosis was worse during her periods. *Id*. She also reported exhaustion and pain as a result of foot spurs. *Id*. On examination, Ms. Johnson displayed tenderness in her belly and the bottom of her feet, but the examination was otherwise unremarkable. (Tr. 930-31).

On March 22, 2022, Ms. Johnson presented to Ankle and Foot Centers of Ohio, complaining of right Achilles tendon and heel pain. (Tr. 1124, 1129). She was prescribed stretching exercises and instructed on proper shoe wear. (Tr. 1129).

Ms. Johnson presented to the Aultman Hospital emergency room on April 26, 2022, complaining of a headache and blurry vision. (Tr. 1363). Ms. Johnson reported that she had a history of migraines. *Id*. She also said that she gets frequent headaches and that her headaches had worsened since she fell the previous month. *Id*. A CT scan of her brain was normal, and she was instructed to drink plenty of fluids and to take Motrin as needed. *Id*.

Ms. Johnson had another follow-up visit with Dr. Singh on October 24, 2022. (Tr. 1246). At that time, her primary diagnosis was Sjogren syndrome. *Id*. She reported that she was dealing with hyperthyroidism, that her hair was falling out, and that she was experiencing palpitations,

dizziness, shaking, recurrent headaches, blurred vision, pain in her legs at night, endometriosis, and hot flashes. *Id*. On examination, she displayed diffuse myofascial tenderness, with tender points in multiple regions. (Tr. 1248). Her examination was otherwise normal. (Tr. 1247-48).

Ms. Johnson visited Dr. Inman on November 3, 2022 to discuss her disability paperwork. (Tr. 1254). A physical examination did not reveal any abnormal findings. *Id*. On February 5, 2023, Dr. Singh advised Ms. Johnson that she could use a moist towel on her eyes in the morning to treat her Sjogren syndrome. (Tr. 1360). He also advised her to use a humidifier at night. *Id*.

On June 16, 2023, Ms. Johnson went to the Alliance Community Hospital emergency room, complaining of vaginal bleeding. (Tr. 1306). She also reported lightheadedness, nausea, abdominal pain, and back pain. *Id*. An ultrasound of her pelvis was negative. (Tr. 1309). At a follow-up visit with Dr. Singh on February 28, 2023, Ms. Johnson reported that she had lost nearly 100 pounds but that the weight loss was not intentional. (Tr. 1349).

Ms. Johnson had a follow-up visit with Dr. Inman on March 7, 2023. (Tr. 1374). She reported malaise, fatigue, hair loss, and myalgia. *Id*. It was noted that she had lost weight. (Tr. 1378). Her examination was normal. *Id*.

Ms. Johnson had an appointment with a podiatrist on June 20, 2023 for her left ankle and foot pain.  (Tr. 1381). She reported that she did not have difficulty walking, climbing stairs, or running errands. (Tr. 1383). She reported that the pain was very tolerable and that she was pleased with the improvement. *Id*. She displayed full sensation and normal range of motion in all joints. (Tr. 1384).

     *2.*    ***Mental Health Issues***

On July 9, 2021, Ms. Johnson went to the emergency room, reporting that she was having suicidal ideations without a plan after a verbal altercation with her boyfriend. (Tr. 448). She said that her boyfriend screamed at her and called her names, and that she felt extremely anxious and

was experiencing PTSD. *Id*. Ms. Johnson reported that she was afraid to be alone because she might have thoughts of self-harm and might act on those thoughts. *Id*. A drug screen came back positive for benzodiazepines. (Tr. 452). She was diagnosed with suicidal ideations without a plan and depression. *Id*. The emotional crisis was deemed resolved, and Ms. Johnson was discharged. (Tr. 455).

On September 27, 2021, Ms. Johnson went to the emergency room, saying that she had overdosed on Xanax, Valium, gabapentin, and ibuprofen. (Tr. 625). She reported that she had taken 16-20 pills, and that it was an intentional overdose with suicidal ideation. *Id*. Ms. Johnson said that she was very stressed because of relationship and chronic health issues. *Id*. She also said that she immediately regretted it. *Id*. On examination, Ms. Johnson was alert, anxious, and oriented to person, time, and place. (Tr. 626). She was diagnosed with acute behavioral disturbance, left buttock cystic area, and chronic abdominal pain, and was discharged. (Tr. 631).

On November 8, 2021, Ms. Johnson had a follow-up visit with Dr. Inman. (Tr. 487). Ms. Johnson complained that her medication had been stopped without her input. *Id*. Dr. Inman explained that her medication had been stopped because she had used it to attempt suicide. *Id*. Ms. Johnson stated that she did not have a counselor because her counselors fired her and that her doctors had abandoned her. *Id*. On examination, Ms. Johnson was alert and cooperative with normal mood and affect, and normal attention span and concentration. (Tr. 491). However, she also jumped topics. *Id*. Dr. Inman diagnosed her with bipolar disorder, obsessive-compulsive personality disorder, borderline personality disorder, history of suicide attempts, anxiety, depression, and PTSD, and referred her to psychiatry. (Tr. 491-92). Dr. Inman also admonished Ms. Johnson that she was not to threaten or curse at the staff and told her that she would not receive medication from his office in light of her suicide attempt. (Tr. 492).

On May 16, 2022, Ms. Johnson enrolled in an outpatient substance abuse treatment

program for opiate use disorder at BrightView. (Tr. 1162). On July 12, 2022, Ms. Johnson reported that she began taking Suboxone the previous fall after she struggled to quit cold turkey. (Tr. 1797). She was diagnosed with severe opioid use disorder. (Tr. 1798). Ms. Johnson also reported diagnoses of panic disorder, generalized anxiety disorder, PTSD, depression, ADHD, and borderline personality disorder. *Id*. She denied any past or current suicidal ideation, plan, intent, or action, and denied any suicide attempts. (Tr. 1799). Ms. Johnson reported that she was able to bathe, feed, and dress herself. (Tr. 1800). On examination, she was oriented to person, time, and place, with normal speech, appropriate mood and affect, logical thought processes and thought content, and normal attention span and concentration. (Tr. 1800-01).

Ms. Johnson received treatment at Springvale Health Centers for mental health issues. On May 23, 2022, she was diagnosed with major depressive disorder, PTSD, and obsessive-compulsive disorder. (Tr. 1221). At a screening appointment on July 25, 2022, Ms. Johnson reported experiencing panic attacks "all day long." (Tr. 1807). She also reported that she had not experienced suicidal ideation since she stopped taking Valium. (Tr. 1808). On examination, Ms. Johnson was well groomed with an euthymic mood, normal speech, logical thought processes and thought content, adequate attention span, intact concentration and memory, and good insight and judgment. (Tr. 1808). She was diagnosed with substance abuse disorder. *Id*.

Ms. Johnson had an appointment at Bright Heart on June 10, 2023. (Tr. 1486). She presented with normal mood and affect, normal speech, and appropriate thought processes and insight. *Id*. She was diagnosed with severe opioid use disorder, restless leg syndrome, and generalized anxiety disorder. *Id*.

## IV.    THE ALJ'S DECISION

The ALJ first determined that Ms. Johnson met the insured status requirements of the Social Security Act through December 31, 2024. (Tr. 20). The ALJ further determined that Ms.

Johnson had not been engaged in substantial gainful activity since November 28, 2020, the alleged onset date of her disability. *Id*.

The ALJ next determined that Ms. Johnson had the following severe impairments: obesity, Sjogren's syndrome, hypermobility syndrome, fibromyalgia, endometriosis, long-haul Covid, plantar fasciitis/osteoarthritis of bilateral feet, lumbar degenerative disc disease/sciatica, cervical degenerative disc disease, postural orthostatic tachycardia syndrome; major depressive disorder, obsessive-compulsive disorder, bipolar disorder, PTSD, anxiety, opioid and cannabis use disorder. *Id*. The ALJ found, however, that none of Ms. Johnson's severe impairments, whether considered singly or in combination, met or medically equaled the severity of any of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Tr. 21).

The ALJ next determined that Ms. Johnson had the residual functional capacity ("RFC") to:

> perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except that the claimant may frequently reach in all directions, may occasionally balance, stoop, kneel, crouch, crawl, may occasionally climb ramps and stairs but may never climb ladders, ropes, or scaffolds; the claimant must avoid all exposure to unprotected heights, hazardous machinery, and commercial driving; the claimant is limited to the performance of simple, routine tasks and to the making of simple, work-related decisions, conducted in a work setting free of production-rate pace, which setting is routine, in that it contemplates few changes.

(Tr. 23-24).

The ALJ next found that Ms. Johnson had no past relevant work. (Tr. 31). However, the ALJ determined that Ms. Johnson could perform jobs that existed in significant numbers in the national economy, including work as a marker, classifier, or housekeeper. (Tr. 32). Accordingly, the ALJ determined that Ms. Johnson was not disabled. (Tr. 33).

## V.     LAW & ANALYSIS

### A.     Standard of Review

"After the Appeals Council reviews the ALJ's decision, the determination of the council becomes the final decision of the Secretary and is subject to review by this Court." *Olive v. Comm'r of Soc. Sec.*, No. 3:06 CV 1597, 2007 WL 5403416, at *2 (N.D. Ohio Sept. 19, 2007) (citing *Abbott v. Sullivan*, 905 F.2d 918, 922 (6th Cir. 1990); *Mullen v. Bowen*, 800 F.2d 535, 538 (6th Cir. 1986) (*en banc*)). The Court's review "is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards." *Winn v. Comm'r of Soc. Sec.*, 615 Fed. Appx. 315, 320 (6th Cir. 2015) (quoting *Cole v. Astrue*, 661 F.3d 931, 937 (6th Cir. 2011)); *see also* 42 U.S.C. § 405(g).

"Under the substantial evidence standard, a court looks to an existing administrative record and asks whether it contains sufficien[t] evidence to support the agency's factual determinations." *Biestek v. Berryhill*, 139 S.Ct. 1148, 1154 (2019) (quotation omitted). The standard for "substantial evidence" is "not high." *Id*. While it requires "more than a mere scintilla," "[i]t means—and means only—such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id*. (quotation omitted).

In addition to considering whether substantial evidence supports the Commissioner's decision, the Court must determine whether the Commissioner applied proper legal standards. Failure of the Commissioner to apply the correct legal standards as promulgated by the regulations is grounds for reversal. *See, e.g.*, *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, however, a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.").

16

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996)) (alteration in original).

### B. <u>Standard for Disability</u>

To establish entitlement to DIB under the Act, a claimant must be insured at the time of disability and must prove an inability to engage "in substantial gainful activity by reason of any medically determinable physical or mental impairment," or combination of impairments, that can be expected to "result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. §§ 404.130, 404.315, 404.1505(a). A disabled claimant may also be entitled to receive SSI benefits. 20 C.F.R. § 416.905; *Kirk v. Sec'y of Health & Human Servs.*, 667 F.2d 524 (6th Cir. 1981). To receive SSI benefits, a claimant must meet certain income and resource limitations. 20 C.F.R. §§ 416.1100 and 416.1201.[2]

Consideration of disability claims follows a five-step review process. 20 C.F.R. §404.1520. First, the claimant must demonstrate that she is not currently engaged in "substantial gainful activity" at the time of the disability application. 20 C.F.R. §§ 404.1520(b) and 416.920(b). Second, the claimant must show that she suffers from a "severe impairment" in order to warrant a finding of disability. 20 C.F.R. §§ 404.1520(c) and 416.920(c). A "severe impairment" is one that "significantly limits . . . physical or mental ability to do basic work activities." *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990).

Third, if the claimant is not performing substantial gainful activity, has a severe impairment

---

[2] The DIB and SSI regulations cited herein are generally identical. Accordingly, for convenience, in some instances, citations to the DIB and SSI regulations regarding disability determinations will be made to the DIB regulations found at 20 C.F.R. § 404.1501 *et seq*. The analogous SSI regulations are found at 20 C.F.R. § 416.901 *et seq*., corresponding to the last two digits of the DIB cite (*e.g.*, 20 C.F.R. § 404.1520 corresponds with 20 C.F.R. § 416.920).

that is expected to last for at least twelve months, and the impairment, or combination of impairments, meets or medically equals a required listing under 20 CFR Part 404, Subpart P, Appendix 1, the claimant is presumed to be disabled regardless of age, education, or work experience. *See* 20 C.F.R. §§ 404.1520(d) and 416.920(d). "An administrative law judge must compare the medical evidence with the requirements for listed impairments in considering whether the condition is equivalent in severity to the medical findings for any Listed Impairment." *Reynolds v. Comm'r of Soc. Sec.*, 424 Fed. Appx. 411, 415 (6th. Cir. 2011). If the impairment meets or equals a listing and satisfies the durational requirement, the ALJ must find that the claimant is disabled. *See Smith-Johnson v. Comm'r of Soc. Sec.*, 579 Fed. Appx. 426, 431 (6th Cir. 2014). However, the claimant must exhibit all elements of the listing; it is not sufficient that a claimant come close to meeting the requirements of a listing. *See Elam v. Comm'r of Soc. Sec.*, 348 F.3d 124, 125 (6th Cir. 2003).

Before considering Step Four, the ALJ must determine the claimant's residual functional capacity, *i.e.*, the claimant's ability to do physical and mental work activities on a sustained basis despite limitations from her impairments. 20 C.F.R. § 404.1520(e) and 416.930(e). At the fourth step, if the claimant's impairment or combination of impairments does not prevent her from doing her past relevant work, the claimant is not disabled. 20 C.F.R. §§ 404.1520(e)-(f) and 416.920(e)-(f). For the fifth and final step, even if the claimant's impairment does prevent her from doing her past relevant work, the claimant is not disabled if other work exists in the national economy that the claimant can perform. 20 C.F.R. §§ 404.1520(g), 404.1560(c), and 416.920(g). *See Abbott*, 905 F.2d at 923.

## C.  Analysis

Ms. Johnson argues that the ALJ erred in three respects: (1) improperly adopting the psychological limitations from the prior ALJ's RFC; (2) misevaluating the opinions of Dr. Singh

and Dr. Inman; and (3) failing to evaluate whether Ms. Johnson's headaches met or equaled a listing and failing to incorporate any limitations from Ms. Johnson's headaches into the RFC. I will address each argument in turn.

### 1. *The ALJ's Treatment of the Prior ALJ's RFC*

In her first assignment of error, Ms. Johnson argues that the ALJ failed to apply proper legal standards because the ALJ adopted the psychological limitations from the prior ALJ's RFC even though Ms. Johnson's application related to a new time period and thus necessitated a fresh review under governing Sixth Circuit precedent. Ms. Johnson's argument is not well-taken.

In *Drummond v. Commissioner of Social Security*, 126 F.3d 837 (6th Cir. 1997), the Sixth Circuit held principles of res judicata apply in the Social Security context, such that "[w]hen the Commissioner has made a final decision concerning a claimant's entitlement to benefits, the Commissioner is bound by this determination absent changed circumstances." *Id*. at 842. Thus, "[a]bsent evidence of an improvement in a claimant's condition, a subsequent ALJ is bound by the findings of a previous ALJ." *Id*.

In response to *Drummond*, the SSA promulgated Acquiescence Ruling 98-4(6), which provides as follows:

> When adjudicating a subsequent disability claim with an unadjudicated period arising under the same title of the Act as the prior claim, adjudicators must adopt such a finding from the final decision by an ALJ or the Appeals Council on the prior claim in determining whether the claimant is disabled with respect to the unadjudicated period unless there is new and material evidence relating to such a finding or there has been a change in the law, regulations or rulings affecting the finding or the method for arriving at the finding.

Acquiescence Ruling 98-4(6), 1998 WL 283902, at *3 (June 1, 1998).

In *Earley v. Commissioner of Social Security*, 893 F.3d 929 (6th Cir. 2018), the Sixth Circuit clarified *Drummond*'s scope. The court held that, while *Drummond* reached the correct result, it "overstat[ed]" its holding. *Id*. at 933. The court noted that principles of "[f]inality,

efficiency, and the consistent treatment of like cases" are important in Social Security proceedings. *Id*. Accordingly, if an individual files a second application covering the same time period as the initial application, res judicata applies unless the claimant provides a justification for revisiting the earlier decision. *Id*.

However, "a claim that one became disabled in 1990 is not the same as a claim that one became disabled in 1994." *Id*. (quoting *Groves v. Apfel*, 148 F.3d 809, 810 (7th Cir. 1998)). And, "[w]hen an individual seeks disability benefits for a distinct period of time, each application is entitled to review." *Id*. Thus, principles of res judicata "do not prevent the agency from giving a fresh look to a new application containing new evidence or satisfying a new regulatory threshold that covers a new period of alleged disability while being mindful of past rulings and the record in prior proceedings." *Id*. at 931.

Here, the ALJ stated at the outset of the decision that, "because of the introduction of evidence, new and material to the determination of disability, it is found that it would not be appropriate to be bound, in their entirety, by the findings of" the prior ALJ. (Tr. 17). Nothing else in the decision indicates that the ALJ believed himself bound by the prior RFC.

Ms. Johnson nonetheless argues that the ALJ violated *Earley* because the ALJ "erroneously adopted the tenor of the RFC which had been adopted in 2020." (ECF No. 8, PageID # 1846). Ms. Johnson also argues that the ALJ improperly formulated an RFC that largely aligned with the prior ALJ's RFC and erroneously found that the opinions of the state agency psychologists were persuasive even though those opinions merely adopted the prior ALJ's RFC.

Ms. Johnson's argument misconstrues the scope of *Earley*. Nothing in *Earley* requires an ALJ to ignore the prior ALJ's decision or to adopt a meaningfully different RFC simply because the claim covers a new time period. To the contrary, the *Earley* court emphasized that "[f]resh review is not blind review." *Id*. at 934. Thus, "[a] later administrative judge may consider what an

earlier judge did if for no other reason than to strive for consistent decision making." *Id.*

The ALJ properly conducted a fresh review here before formulating the RFC, extensively discussing evidence postdating the prior decision. (Tr. 21-31). Among other things, the ALJ noted that Ms. Johnson denied significant difficulties understanding and following instructions, remembering information, socializing, and making decisions. (Tr. 22-23). The ALJ also cited to treatment notes showing that Ms. Johnson exhibited normal memory without cognitive impairment, a pleasant demeanor, normal mood and affect, normal concentration, and good insight and judgment. (Tr. 22-23). The ALJ further acknowledged contrary information postdating the prior decision, including Ms. Johnson's overdose in September 2021. (Tr. 23). However, the ALJ concluded, on balance, that Ms. Johnson did not meet or equal a listing and that the RFC was appropriate. That conclusion did not violate *Earley* simply because the RFC was similar to the prior RFC.

The fact that the ALJ cited to *Drummond* but not *Earley* is of no moment. *See Hoffacker v. Comm'r of Soc. Sec.*, No. 1:23-cv-01010, 2024 WL 692690, at *8 (N.D. Ohio Feb. 20, 2024) ("remand might not be warranted simply because an ALJ cited *Drummond* in support [of] their findings or failed to cite *Earley*"). Rather, "[w]hen an ALJ makes an outdated reference to the *Drummond* standard, courts have focused on whether 'the ALJ properly applied the correct legal standards in a manner consistent with the Sixth Circuit's decision in *Earley*,' rather than the outdated citation itself." *Pollard v. Comm'r of Soc. Sec.*, No. 1:22-cv-00082, 2023 WL 4706763, at *6 (N.D. Ohio July 24, 2023) (citing *Civitarese v. Comm'r of Soc. Sec.*, No. 1:19-CV-2015, 2020 WL 4366077, at *13 (N.D. Ohio July 30, 2020)). The ALJ applied the correct legal standard in this case.

Ms. Johnson also cites to evidence in the record that she believes should have led the ALJ to adopt a more restrictive RFC. As the Sixth Circuit has held, however, "the Commissioner's

decision cannot be overturned if substantial evidence, or even a preponderance of the evidence, supports the claimant's position, so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003). A reviewing court may not "try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility." *O'Brien v. Comm'r of Soc. Sec.*, 819 F. App'x 409, 416 (6th Cir. 2020) (quoting *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984)). Ms. Johnson's argument that the ALJ violated *Earley* is without merit, and I recommend that the Court reject her first assignment of error.

### 2.    *The ALJ's Evaluation of the Opinion Evidence*

In her second assignment of error, Ms. Johnson argues that the ALJ erred in evaluating the opinions of her treating physicians, Dr. Singh and Dr. Inman. Ms. Johnson's argument is without merit.

Because Ms. Johnson filed her disability claim after March 27, 2017, the "treating physician" rule, pursuant to which an ALJ was required to give controlling weight to an opinion from a treating physician absent good reason not to, does not apply. *See* 20 C.F.R. § 404.1527; *Merrell v. Comm'r of Soc. Sec.*, 1:20-cv-769, 2021 WL 1222667, at *6 (N.D. Ohio Mar. 16, 2021), *report and recommendation adopted*, 2021 WL 1214809 (N.D. Ohio Mar. 31, 2021). Instead, the current regulations state that the SSA "will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s), including those from [the claimant's] medical sources." 20 C.F.R. § 404.1520c(a).

The SSA considers opinions from medical sources under five factors: (1) supportability; (2) consistency; (3) relationship with the claimant; (4) specialization; and (5) other factors, such as familiarity with other evidence in the claim or with the disability program's policies and evidentiary requirements. 20 C.F.R. § 404.1520c(c). Section 404.1520c(b)(1) specifically provides

that "it is not administratively feasible for [the ALJ] to articulate in each determination or decision how [the ALJ] considered all of the factors for all of the medical opinions and prior administrative medical findings in your case record." 20 C.F.R. § 404.1520c(b)(1). Of the five factors, supportability and consistency are the most important, and an ALJ must explain how the ALJ considered them. 20 C.F.R. § 404.1520c(b)(2). The ALJ "may" but "is not required to" explain how the ALJ considered the remaining factors. *Id*.

The "supportability" factor looks to how well the medical source supports the opinion with objective medical evidence from the record. *See* 20 C.F.R. § 404.1520c(c)(1). "In other words, the supportability analysis focuses on the physicians' explanations of the opinions." *Lavenia v. Comm'r of Soc. Sec.*, No. 3:21cv674, 2022 WL 2114661, at *2 (N.D. Ohio June 13, 2022) (quoting *Coston v. Comm'r of Soc. Sec.*, No. 20-12060, 2022 WL 989471, at *3 (E.D. Mich. Mar. 31, 2022)). The "consistency" factor looks to how consistent the medical opinion is with evidence from other medical and nonmedical sources. *See* 20 C.F.R. § 404.1520c(c)(2). "As long as the ALJ discussed the supportability and consistency of the opinion and supported [the ALJ's] conclusions with substantial evidence within his decision, the Court will not disturb [the ALJ's] decision." *Njegovan v. Comm'r of Soc. Sec. Admin.*, No. 5:21-CV-00002-CEH, 2022 WL 1521910, at *4 (N.D. Ohio May 13, 2022).

### i.    Dr. Singh

As discussed above, Dr. Singh issued two opinions, one regarding Ms. Johnson's physical limitations and one regarding her psychological limitations. With respect to her physical impairments, Dr. Singh opined that Ms. Johnson could only sit or stand for 15 minutes at a time, could only stand or walk for two hours per day, and would need breaks every 15 minutes. (Tr. 1008). He also opined that Ms. Johnson was limited in her ability to lift and carry and that she would be off-task for more than 25% of the day and absent from work more than four days per

month. (Tr. 1008-10). With respect to Ms. Johnson's psychological impairments, Dr. Singh opined that Ms. Johnson  had severe limitations in numerous functional categories. (Tr. 1244-45).

In finding that Dr. Singh's opinions were not persuasive, the ALJ evaluated both their supportability and their consistency in accordance with the applicable regulations. With respect to supportability, the ALJ noted that Dr. Singh's opinions regarding Ms. Johnson's absenteeism, off-task behaviors, and need for additional breaks were inconsistent with his treatment records showing that Ms. Johnson generally appeared for her appointments and was able to participate in her own treatment and planning. (Tr. 29, 31). An ALJ properly addresses supportability by noting that a physician's opinion is inconsistent with the physician's own treatment records. *See Rattliff v. Comm'r of Soc. Sec.*, No. 1:20-cv-01732, 2021 WL 7251036, at *9 (N.D. Ohio Oct. 29, 2021) (holding that ALJ addressed supportability factor by noting that physician's opinion was inconsistent with physician's treating notes), *report and recommendation adopted*, 2022 WL 627055 (N.D. Ohio Mar. 3, 2022); *Neff v. Comm'r of Soc. Sec.*, No. 5:18 CV 2492, 2020 WL 999781, at *11 (N.D. Ohio Mar. 2, 2020).

The ALJ also directly addressed consistency, finding that Dr. Singh's opinions regarding Ms. Johnson's physical limitations were inconsistent with the record as a whole, including treatment records showing largely normal musculoskeletal findings, no motor or sensory deficits, and normal gait and coordination, as well as Ms. Johnson's own reports of her daily activities. (Tr. 28-29). Similarly, with respect to Ms. Johnson's mental impairments, the ALJ found that Dr. Singh's opinions were inconsistent with records showing that she had a normal fund of knowledge; normal memory, attention, and concentration; logical thought processes; and an ability to bear stressors and to serve as a caregiver for her mother and child. (Tr. 30-31). The ALJ's analysis properly addressed the consistency factor. *See Merrell*, 2021 WL 1222667 at *7 (holding that ALJ's decision to discount weight given to opinion from treating physician was supported by

substantial evidence where opinion was inconsistent with other evidence in the record); *Creter v. Saul*, No. 1:20-cv-00840, 2021 WL 809323, at *11 (N.D. Ohio Mar. 3, 2021) (holding that ALJ did not err where ALJ specifically cited treatment records ALJ believed were inconsistent with treating physician's opinion and explained why).

Ms. Johnson does not dispute that the ALJ addressed the supportability and consistency of Dr. Singh's opinions. Instead, she argues that other evidence in the record supported those opinions. As noted above, however, a reviewing court cannot overturn the ALJ's decision if substantial evidence supports it, even if other evidence could have led to a different conclusion. *See Jones*, 336 F.3d at 477. Substantial evidence supports the ALJ's findings here, and the ALJ did not err in rejecting Dr. Singh's opinion as unpersuasive.

### ii.       Dr. Inman

The ALJ also did not err in evaluating the opinion of Dr. Inman, who opined that Ms. Johnson had psychological limitations in a number of functional categories, including her ability to sustain an ordinary routine, work in proximity to others, complete a normal workday, accept instructions, get along with coworkers and peers, carry out instructions, maintain attention and concentration, perform at a consistent pace, and interact appropriately with coworkers and the general public. (Tr. 1262-63). Dr. Inman also opined that Ms. Johnson would be absent from work most days and would be off-task nearly 100% of the time. *Id*.

As with Dr. Singh's opinions, the ALJ found that Dr. Inman's opinion was not supported by his treatment records to the extent Dr. Inman opined that Ms. Johnson would be frequently absent from work and continually off-task. (Tr. 31). The ALJ further found that Dr. Inman's opinions were inconsistent with the record as a whole, and that Dr. Inman overstated Ms. Johnson's cognitive, social, and adaptive limitations. *Id*. Ms. Johnson again argues only that the ALJ erred in weighing the evidence and in failing to credit evidence that she believes supported

Dr. Inman's opinions. Because substantial evidence supports the ALJ's weighing of the evidence with respect to Dr. Inman's opinions, remand is not warranted, *See Jones*, 336 F.3d at 477. I therefore recommend that the Court reject Ms. Johnson's second assignment of error.

### 3. The ALJ's Evaluation of Ms. Johnson's Headaches

In her third and final assignment of error, Ms. Johnson argues that the Court should remand the case because the ALJ erred in evaluating Ms. Johnson's headaches. Ms. Johnson's argument has two components. First, she argues that the ALJ erred at Step Three because the ALJ failed to consider whether her met or equaled a listing. Second, she argues that the ALJ erred because the ALJ did not consider whether her headaches impose any functional limitations when formulating Ms. Johnson's RFC.

#### i. The ALJ's Step Three Analysis

As noted above, at Step Three, the ALJ must compare the medical evidence to the requirements of the listed impairments to determine whether the claimant meets or medically equals any listing. *See* 20 C.F.R. §§ 404.1520(d) and 416.920(d); *Reynolds*, 424 Fed. Appx. at 415. The SSA has promulgated Social Security Ruling ("SSR") 19-4p to "explain [Agency] policy on how we establish that a person has a[ ] [medically determinable impairment] of a primary headache disorder and how we evaluate primary headache disorders in disability claims." SSR 19-4p, 2019 WL 4169635, at *2 (Aug. 26, 2019). The regulations require that the "[medically determinable impairment] be established by objective medical evidence from an acceptable medical source." *Id*. (footnotes omitted).

SSR 19-4p states in relevant part:

> Primary headache disorder is not a listed impairment in the Listing of Impairments (listings);[ ] however, we may find that a primary headache disorder, alone or in combination with another impairment(s), medically equals a listing.[ ]
>
> Epilepsy (listing 11.02) is the most closely analogous listed impairment for an MDI of a primary headache disorder. While uncommon, a person

with a primary headache disorder may exhibit equivalent signs and limitations to those detailed in listing 11.02 (paragraph B or D for dyscognitive seizures), and we may find that his or her MDI(s) medically equals the listing.

Paragraph B of listing 11.02 requires dyscognitive seizures occurring at least once a week for at least 3 consecutive months despite adherence to prescribed treatment. To evaluate whether a primary headache disorder is equal in severity and duration to the criteria in 11.02B, we consider: A detailed description from an AMS of a typical headache event, including all associated phenomena (for example, premonitory symptoms, aura, duration, intensity, and accompanying symptoms); the frequency of headache events; adherence to prescribed treatment; side effects of treatment (for example, many medications used for treating a primary headache disorder can produce drowsiness, confusion, or inattention); and limitations in functioning that may be associated with the primary headache disorder or effects of its treatment, such as interference with activity during the day (for example, the need for a darkened and quiet room, having to lie down without moving, a sleep disturbance that affects daytime activities, or other related needs and limitations).

Paragraph D of listing 11.02 requires dyscognitive seizures occurring at least once every 2 weeks for at least 3 consecutive months despite adherence to prescribed treatment, and marked limitation in one area of functioning. To evaluate whether a primary headache disorder is equal in severity and duration to the criteria in 11.02D, we consider the same factors we consider for 11.02B and we also consider whether the overall effects of the primary headache disorder on functioning results in marked limitation in: Physical functioning; understanding, remembering, or applying information; interacting with others; concentrating, persisting, or maintaining pace; or adapting or managing oneself.

SSR 19-4p, 2019 WL 4169635 at *7.

Ms. Johnson argues that the ALJ committed reversible error because the ALJ did not analyze whether Ms. Johnson's headaches medically equaled Listing 11.02. The Commissioner acknowledges that the ALJ did not discuss Listing 11.02B or 11.02D, but argues that any error in failing to analyze those listings was harmless. I agree.

As an initial matter, while Ms. Johnson's counsel argued that she met or equaled several listings at the administrative hearing, counsel did not argue that Ms. Johnson's headaches met or equaled Listing 11.02. (Tr. 52-53, 77). "Where the claimant does not mention the particular Listing at the hearing before the ALJ, the Sixth Circuit has found that the ALJ is not obligated to discuss

that particular Listing." *McGeever v. Comm'r of Soc. Sec.*, No. 1:18CV0477, 2019 WL 1428208, at *7 (N.D. Ohio Mar. 29, 2019) (citing *Wilson v. Comm'r of Soc. Sec.*, 618 F. App'x 281, 286 (6th Cir. 2015)) (per curium); *see also Malone v. Comm'r of Soc. Sec.*, 507 F. App'x 470, 472 (6th Cir. 2012) (finding no error where plaintiff "did not argue that he had a listed impairment at his administrative hearing, even though he was represented by counsel at that time").

Regardless, "neither the listings nor the Sixth Circuit require the ALJ to 'address every listing' or 'to discuss listings that the applicant clearly does not meet.'" *Smith-Johnson*, 579 F. App'x. at 432 (quoting *Sheeks v. Comm'r of Soc. Sec. Admin.*, 544 F. App'x 639, 641 (6th Cir. 2013)). Instead, an ALJ should discuss a listing "where the record raises 'a substantial question as to whether [the claimant] could qualify as disabled' under a listing." *Id*. at 43 (quoting *Abbott v. Sullivan*, 905 F.2d 918, 925 (6th Cir. 1990)); *see also Pasiak v. Comm'r of Soc. Sec.*, 800 F. App'x 301, 304 (6th Cir. 2019) ("to decide whether the ALJ erred in her cursory step-three analysis, we must determine whether the record raises a 'substantial question' as to whether Pasiak could qualify as disabled under one of the listings").

It is the claimant's burden at Step Three to prove that an impairment medically equals a listing. *See Lusk v. Comm'r of Soc. Sec.*, 106 F. App'x 405, 411 (6th Cir. 2004). To meet that burden, "[a] claimant must do more than point to evidence on which the ALJ could have based his finding to raise a 'substantial question' as to whether he has satisfied a listing." *Smith-Johnson*, 579 F. App'x at 432. "Rather, the claimant must point to specific evidence that demonstrates he reasonably could meet or equal every requirement of the listing." *Id*.; *see also Thacker v. Soc. Sec. Admin.*, 93 F. App'x 725, 728 (6th Cir. 2004) (holding that claimant must "present specific medical findings that satisfy the various tests listed in the description of the applicable impairment or present medical evidence which describes how the impairment has such equivalency"). "Absent such evidence, the ALJ does not commit reversible error by failing to evaluate a listing at Step

Three." *Smith-Johnson*, 579 F. App'x at 433; *see also Forrest v. Comm'r of Soc. Sec.*, 591 F. App'x 359, 366 (6th Cir. 2014) (holding that ALJ's failure to evaluate listing at Step Three is harmless where claimant cannot show that impairments met or medically equaled listing).

Ms. Johnson has not raised a substantial question regarding whether she medically equals Listing 11.02. Treatment records do indicate that Ms. Johnson experienced headaches during the relevant period, and that she went to the hospital at least once because of severe headache symptoms. (Tr. 450, 541, 668, 674, 942, 1352, 1363). However, Ms. Johnson has not identified evidence from an acceptable medical source regarding associated phenomena of her headaches, their frequency, or the limitations in functioning that they impose. In addition, at the administrative hearing, Ms. Johnson agreed with the ALJ that her non-migraine headaches were typically "more of a nuisance and pain." (Tr. 57-58). She also testified that, while her migraines were debilitating, she had not experienced a migraine in roughly two months, and that her headache condition had improved. *Id*.

Ms. Johnson thus has not met her burden of showing a substantial question that her headaches medically equal Listing 11.02. As a result, any Step Three error is harmless. *See Ackerman v. Comm'r of Soc. Sec.*, No. 3:23-CV-00224-JGC, 2023 WL 8720395, at *19 (N.D. Ohio Nov. 27, 2023) (holding that any Step Three error was harmless where claimant failed to show that headaches equaled Listing 11.02B), *report and recommendation adopted*, 2023 WL 8717462 (N.D. Ohio Dec. 18, 2023); *Cooper v. Comm'r of Soc. Sec.*, No. 3:22-CV-01248-JRK, 2023 WL 4078982, at *11 (N.D. Ohio May 3, 2023) (holding that failure to analyze listing 11.02B was harmless where claimant "points to no record evidence demonstrating she experienced headaches for a three-month period at the frequencies required under Listing 11.02B (once a week) or Listing 11.02D (at least once every two weeks)") (emphasis omitted), *report and recommendation adopted*, 2023 WL 4699650 (N.D. Ohio July 24, 2023); *Figueroa v. Comm'r of*

*Soc. Sec.*, No. 1:24-cv-00282, 2024 WL 4866328, at *15 (N.D. Ohio Nov. 22, 2024) (holding that ALJ did not err in failing to analyze Listing 11.02B where ALJ reasonably determined that headaches constituted non-severe impairment), *report and recommendation adopted*, 2025 WL 240740 (N.D. Ohio Jan. 19, 2025).

### ii.    The ALJ's Failure to Consider Ms. Johnson's Headaches When Formulating Her RFC

Ms. Johnson also argues that the ALJ erred because, despite finding that Ms. Johnson had a non-severe headache condition, the ALJ did not analyze whether her headaches imposed any functional limitations while formulating her RFC. Ms. Johnson's argument is not well-taken.

SSR 96-8p provides that "[i]n assessing RFC, the adjudicator must consider limitations and restrictions imposed by all of an individual's impairments, even those that are not 'severe.'" 1996 WL 374184, at *5 (July 2, 1996). SSR 96-8p further states that "While a 'not severe' impairment(s) standing alone may not significantly limit an individual's ability to do basic work activities, it may—when considered with limitations or restrictions due to other impairments—be critical to the outcome of a claim." *Id*.

In *Emard v. Commissioner of Social Security*, 953 F.3d 844 (6th Cir. 2020), the Sixth Circuit clarified an ALJ's obligations under SSR 96-8p with respect to non-severe impairments. The court noted that "[d]istrict courts in this circuit have held that an ALJ need not specifically discuss all nonsevere impairments in the residual-functional-capacity assessment when the ALJ makes clear that her decision is controlled by SSR 96-8p." *Id*. at 851-52. The court agreed with those cases, holding that the ALJ's "express reference to SSR 96-8p, along with her discussion of the functional limitations imposed by [the claimant's] nonsevere impairments at step two of the analysis" meant that the ALJ complied with SSR 96-8p, even though the ALJ failed to specifically discuss the claimant's non-severe impairments when formulating the RFC. *Id*. at 852.

Here, the ALJ cited SSR 96-8p while summarizing the applicable legal standards, noting

that he must "consider all of the claimant's impairments, including impairments that are not severe." (Tr. 19). At Step Two, the ALJ found that Ms. Johnson had several non-severe impairments, including headaches. (Tr. 20). However, the ALJ also found that "[a] combination of factors, including spontaneous resolution of the condition, or resolution by a course of medications, duration of less than the requisite twelve months, failure of objective testing to sustain a diagnosis, scarcity of treatment or a sporadic history of treatment, indicate that the existence of these conditions will not cause more than minimal limitations on the claimant's ability to engage in basic work activity and are therefore non-severe." *Id*. The ALJ then stated that he "considered all of the claimant's medically determinable impairments, including those that are not severe, when assessing the claimant's residual functional capacity." *Id*.

I conclude that the ALJ's analysis, while brief, complied with SSR 96-8p and *Emard*. Indeed, post-*Emard* decisions from this district have affirmed the Commissioner in similar circumstances. *See Holt v. Comm'r of Soc. Sec.*, No. 1:23-CV-00209-BMB, 2023 WL 8770503, at *8 (N.D. Ohio Nov. 1, 2023) (affirming ALJ's decision despite failure to discuss non-severe impairments when formulating RFC where ALJ cited to SSR 96-8p when summarizing applicable law, discussed the functional limitations claimant's non-severe impairments imposed at Step Two, and stated that ALJ considered all of the claimant's impairments, including non-severe impairments, when formulating the RFC), *report and recommendation adopted*, 2024 WL 83029 (N.D. Ohio Jan. 8, 2024); *Yost v. Comm'r of Soc. Sec.*, No. 1:23-CV-00699-JRA, 2024 WL 1054234, at *7-9 (N.D. Ohio Jan. 26, 2024) (same), *report and recommendation adopted*, 2024 WL 1051654 (N.D. Ohio Mar. 11, 2024); *Nelson v. Comm'r of Soc. Sec.*, No. 1:21-CV-01784-JG, 2023 WL 2435322, at *16 (N.D. Ohio Jan. 31, 2023) (holding that ALJ complied with *Emard* where ALJ determined at Step Two that claimant's non-severe impairments would not cause more than a minimal limitation in claimant's ability to engage in work-related activities for more than a

12-month period), *report and recommendation adopted*, 2023 WL 2431989 (N.D. Ohio Mar. 9, 2023).

This is a close case, and I do not intend to overstate the extent of the ALJ's analysis. The ALJ did not discuss any specific treatment records regarding Ms. Johnson's headaches. Nor did the ALJ discuss her hearing testimony on that issue. It would have been preferable for the ALJ to discuss more fully why he believed that Ms. Johnson's headaches and her other non-severe impairments did not impose functional limitations. However, in light of *Emard* and the ALJ's citation to SSR 96-8p, I conclude that the ALJ applied proper legal standards. It is also significant that Ms. Johnson "does not assert any functional limitations" caused by her headaches that she believes the ALJ should have incorporated in particular. *Holt*, 2023 WL 8770503 at *8. Accordingly, I recommend that the Court reject Ms. Johnson's argument that the ALJ erred in failing to discuss her headaches while formulating the RFC.[3]

## VI.      RECOMMENDATION

Based on the foregoing, I RECOMMEND that the Court AFFIRM the Commissioner's final decision.

Dated: April 29, 2025

*/s Jennifer Dowdell Armstrong*
Jennifer Dowdell Armstrong
U.S. Magistrate Judge

## VII.    NOTICE TO PARTIES REGARDING OBJECTIONS

Local Rule 72.3(b) of this Court provides:

---

[3] While not included as a separate assignment of error, Ms. Johnson briefly argues within her third assignment of error that the ALJ failed to discuss her non-severe impairment of hidradenitis suppurativa when formulating the RFC. Ms. Johnson's argument fails for the same reason as her argument regarding her headaches.

> **Any party may object to a Magistrate Judge's proposed findings, recommendations or report made pursuant to Fed. R. Civ. P. 72(b) within fourteen (14) days after being served with a copy thereof, and failure to file timely objections within the fourteen (14) day period shall constitute a waiver of subsequent review, absent a showing of good cause for such failure**. Such party shall file with the Clerk of Court, and serve on the Magistrate Judge and all parties, written objections which shall specifically identify the portions of the proposed findings, recommendations, or report to which objection is made and the basis for such objections. **Any party may respond to another party's objections within fourteen (14) days after being served with a copy thereof.** The District Judge to whom the case was assigned shall make a <u>de novo</u> determination of those portions of the report or specified proposed findings or recommendations to which objection is made and may accept, reject, or modify, in whole or in part, the findings or recommendations made by the Magistrate Judge. The District Judge need conduct a new hearing only in such District Judge's discretion or where required by law, and may consider the record developed before the Magistrate Judge, making a determination on the basis of the record. The District Judge may also receive further evidence, recall witnesses or recommit the matter to the Magistrate Judge with instructions.

*Id.* (emphasis added).

Failure to file objections within the specified time may result in the forfeiture or waiver of the right to raise the issue on appeal either to the district judge or in a subsequent appeal to the United States Court of Appeals, depending on how or whether the party responds to the report and recommendation. *Berkshire v. Dahl*, 928 F.3d 520, 530 (6th Cir. 2019). Objections must be specific and not merely indicate a general objection to the entirety of the report and recommendation; a general objection has the same effect as would a failure to object. *Howard v. Sec'y of Health and Hum. Servs.*, 932 F.2d 505, 509 (6th Cir. 1991).

Stated differently, objections should focus on specific concerns and not merely restate the arguments in briefs submitted to the magistrate judge. "A reexamination of the exact same argument that was presented to the Magistrate Judge without specific objections 'wastes judicial resources rather than saving them, and runs contrary to the purpose of the Magistrates Act.'" *Overholt v. Green*, No. 1:17-CV-00186, 2018 WL 3018175, *2 (W.D. Ky. June 15, 2018) (quoting *Howard*). The failure to assert specific objections may in rare cases be excused in the

interest of justice. *See United States v. Wandahsega*, 924 F.3d 868, 878-79 (6th Cir. 2019).